IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

MICHELLE COUCH,

      Plaintiff,

v.                                CASE NO. 5:12-cv-297-RS-CJK

FRANK McKEITHEN, in his official
capacity as SHERIFF BAY COUNTY,
FLORIDA,

      Defendant.
_____/

## ORDER

Before me are Defendant's Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 34), Plaintiff's Response and Memorandum in Opposition to Defendant's Motion for Summary Judgment (Doc. 43), and Defendant's Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment (Doc. 53).

## I. STANDARD OF REVIEW

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S. Ct. 2505, 2512 (1986). The moving party has the burden of showing the absence of a genuine issue as to

any material fact, and in deciding whether the movant has met this burden, the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). Thus, if reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment. *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) (citing *Mercantile Bank & Trust v. Fidelity & Deposit Co.*, 750 F.2d 838, 841 (11th Cir. 1985)). However, a mere 'scintilla' of evidence supporting the nonmoving party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party. *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 251).

## II. BACKGROUND

I accept the facts in the light most favorable to Plaintiff. *See Galvez v. Bruce*, 552 F.3d 1238, 1239 (11th Cir. 2008) (citing *Vinyard v. Wilson*, 311 F.3d 1340, 1343 n.1 (11th Cir. 2002)). " 'All reasonable doubts about the facts should be resolved in favor of the non-movant.' " *Id.* (quoting *Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 (11th Cir. 1999); *Clemons v. Dougherty County*, 684 F.2d 1365, 1368-69 (11th Cir. 1982).

Defendant Frank McKeithen is the Sheriff of Bay County, Florida. Plaintiff was employed by Defendant in September 2007 as a records clerk in the Support Services Division of the Bay County Sheriff's Office ("BCSO"). (Doc. 42-12, p. 6). Her chain of command included Becky Johns, Lt. Tim Hightower, Capt. Joel Heape, Mjr. Tommy Ford, and Sheriff McKeithen. *Id.* at 8-9. As a records clerk, Plaintiff input data for "validations" regarding the status of stolen vehicles, missing persons, guns, and other matters. *Id.* at 9-10. This information was required to be updated in compliance with certain deadlines established by the Florida Department of Law Enforcement. *Id.* at 61. Hightower reviewed Plaintiff's validations, but for all her other work, Plaintiff reported to Johns. *Id.* She would also answer phones, conduct background checks, and prepare reports. *Id.*

On April 3, 2008, Plaintiff acknowledged receipt of the Sheriff's policy on workplace discrimination and harassment. (Doc. 35-2, p. 24). The police stated:

> An employee who feels that he or she has been subjected to harassment should immediately report such activity to his/her supervisor. If for any reason, the employee is reluctant to report the matter to his or her supervisor or is not satisfied after bringing the matter to the supervisor's attention, the employee may contact the Professional Standards Unit.

*Id.* at 29. Lt. Bethany Harris supervises the Professional Standards Unit and conducts internal investigations.

Plaintiff's work area was an open space with four other females, including Johns, working in cubicles. Hightower had a separate office. (Doc. 42-12, p. 12).

Plaintiff described the work environment as "laid back." Plaintiff and her co-workers engaged in horseplay, joking, and discussions of personal matters during working hours. *Id.* at 18.

Sometime during her first year of employment, Plaintiff experienced problems with her personal computer. *Id.* at 22-23. Plaintiff brought her computer to the information technology employees, Wilkes and Hightower, who diagnosed the problem and offered to fix it for her. Hightower installed a new hard drive. Soon after Hightower installed the new hard drive, Plaintiff suspected him of logging onto her computer, spying on her, and deleting Facebook messages. *Id.* at 26-27. Plaintiff informed Capt. Stanford, a separate division commander, and he and Capt. Heape went to her home, inspected the computer, and determined that Hightower had installed a remote access application on her computer. *Id.* at 28. However, they concluded that Plaintiff's belief that Hightower was spying on her was unfounded because he would not be able to access the computer without Plaintiff's knowledge or permission.

Plaintiff alleges that Hightower made sexual comments and advances toward her for three years before her employment with Defendant ended. She believes that Hightower made sexual jokes towards her—not the office—at least once a week. Hightower also said that Plaintiff should select the time and place, which Plaintiff took as a sexual advance. *Id.* at 36-37. When Hightower sat on Plaintiff's

4

chair to work on her computer, he would tell Plaintiff to sit on his lap and that they would discuss whatever popped up. *Id.* at 39-40. Five or six times, Hightower walked around the office with his fingers in a V shape and stick his tongue in between his fingers. *Id.* at 40-42. Plaintiff also alleges that Hightower would look her up and down at least once a week and on several occasions told her she had a "nice ass." *Id.* at 52-53. Once he also asked her if she was wearing underwear and made a joke references the circumference of a rubber band to the girth of his genitals. Between five and ten times, Hightower threw pennies at Plaintiff. She believes he was purposely aiming them down her shirt. *Id.* at 71-72. Johns witnessed some of this behavior and discussed it with Plaintiff. *Id.* at 44-45.

On April 22, 2011, Plaintiff received a verbal reprimand for failing to timely complete her validations and for failing to report to work one day due to a personal relationship. (Doc. 42-4; 42-12, p. 68). Plaintiff contends that she was not the only person who was late with her validations, but she was the only one who received disciplinary action. (Doc. 42-12, p. 66). No memo appeared her in personnel file, and there was no change in her salary, benefits, or job in general. *Id.* at 69.

On June 28, 2011, there was an incident with Hightower. Plaintiff claims that after lunch, Hightower came up behind her and slid his hand down the front of her shirt to the very top of her breast. *Id.* at 78. Hightower denies that he touched her breast, but admits that he did touch her. Plaintiff informed Johns, and Johns

5

asked if Plaintiff wanted to file a complaint. Plaintiff responded that she wanted to think about it. *Id.* at 80-81.

Later that day, Plaintiff told her boyfriend, Mr. Walker, about the incident, who reported it to Major Ford. *Id.* at 82. Major Ford directed Lt. Harris to contact Plaintiff. Lt. Harris and Plaintiff scheduled a meeting for the following morning. After Johns was informed that Plaintiff reported the incident elsewhere, Johns reported it to Captain Heape. Plaintiff also spoke to Captain Rick Ramie, another division commander, about transferring to his division.

On June 29, 2011, Plaintiff met with Lt. Harris. (Doc. 41-12, p. 48). Lt. Harris's summary was that Hightower touched Plaintiff's collarbone, not breast, but Plaintiff argues that is incorrect. *Id.* at 49. Additionally, Plaintiff told Harris of the other advances and inappropriate comments from over the years. After this meeting, Lt. Harris and Plaintiff met with Major Ford, and Plaintiff was again provided with a copy of the sexual harassment policy. *Id.* at 84. When asked whether she wanted to proceed with a formal or informal investigation, Plaintiff replied that she preferred an informal investigation. *Id.* at 88. She further stated that she did not want Hightower to lose his job, but could not work with him. *Id.* at 85. Although she says she could not work with him and spoke to a different division commander about transferring, Plaintiff contends that she did not ask for a transfer. For the remainder of the day, Plaintiff stayed in Lt. Harris's office doing

6

clerical work. *Id.* at 86. Hightower was given an order by Cpt. Heape to have no contact with Plaintiff.

On June 30, 2011, Plaintiff was temporarily assigned to the Civil Division pending the outcome of the informal investigation. While in the Civil Division, Plaintiff was supervised by Sgt. Vicki Heath. The Civil Division was two doors down from her previous assignment. *Id.* at 95. Also on June 30th, Plaintiff provided a recorded interview for Lt. Harris. She reiterated that she preferred an informal investigation, did not want Hightower to lose his job, and stated, "I just feel that removing myself from the situation is the best way to handle that." While working in the Civil Division, her schedule, pay, and benefits were the same, and the clerical duties were comparable. Plaintiff had previously approved annual leave, so she only worked 5-6 days in July. (Doc. 42-6). She returned from leave on July 18, 2011, and was formally transferred to the Civil Division. (Doc. 42-7).

On July 20, 2011, Plaintiff told Major Ford that she was unhappy with Hightower working in the same building. *Id.* at 92. Ford gave Plaintiff the option of taking a leave of absence and requested the Human Resources Manager Sabrena Goodwin to determine other available positions that were not in the building. (Doc. 42-8; Doc. 42-12, p. 93). Goodwin contacted Plaintiff with three potential positions, but Plaintiff was unable to accept any of them because of scheduling. (Doc. 42-12, p. 96).

On July 22, 2011, Sheriff McKeithen directed that the investigation be changed to a formal one. The no contact order was repeated to Hightower. Plaintiff was given the option to return to the Civil Division or to remain on leave. Plaintiff remained on leave. *Id.* at 99-100.

On August 1, 2011, Plaintiff submitted a letter of resignation. (Doc. 42-9_. On August 3, 2011, Lt. Harris spoke to Plaintiff on behalf of Sheriff McKeithen and asked that she rescind her resignation pending the outcome of the investigation and offered to place her on administrative leave with pay. On August 4, 2011, Plaintiff denied the request to rescind her resignation. (Doc. 42-10). Plaintiff claims that she felt she had no other choice but to resign.

Although Plaintiff resigned, the investigation continued. Harris concluded that the complaint of sexual harassment was not sustained because there was no corroboration from Plaintiff's co-workers. (Doc. 42-1). However, Hightower was given a code of conduct violation for his touching of Plaintiff without permission. As a result of this violation, Hightower was suspended for five days without pay and required to attend remedial training for workplace harassment. Hightower's duty station was also relocated to Bay County Jail, and his supervisory duties were removed. (Doc. 41-12, p. 107).

8

## III. ANALYSIS

*Sexual Harassment*

Plaintiff's first claim is for hostile work environment gender discrimination. To establish a hostile work environment discrimination claim under Title VII, Plaintiff must show:

> (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.

*Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1245 (11th Cir. 1999). Defendant argues only that Plaintiff cannot establish the fourth and fifth prongs, therefore, I will address only those two.

Defendant argues that Plaintiff did not establish that the alleged harassment was sufficiently severe or pervasive to alter the conditions of her employment or create an abusive work environment. Defendant agrees that Plaintiff was subjectively offended by Hightower's conduct, and therefore, the Court need consider only the objective component for severity or pervasiveness.

To assess the objective component, the Eleventh Circuit has cited four factors to help determine whether the harassment was severe or pervasive: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct

9

is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Mendoza*, 195 F.3d at 1246.

As stated in the Background section, Plaintiff alleges that Hightower had made sexual comments and advances towards her for years. She believes that Hightower made sexual jokes towards her—not the office—at least once a week. Hightower also said that Plaintiff should select the time and place, which Plaintiff took as a sexual advance. When Hightower sat on Plaintiff's chair to work on her computer, he would tell Plaintiff to sit on his lap and that they would discuss whatever popped up.  Five or six times, Hightower walked around the office with his fingers in a V shape and stick his tongue in between his fingers. Plaintiff also alleges that Hightower would look her up and down at least once a week and on several occasions told her she had a nice ass. Once he also asked her if she was wearing underwear and made a joke references the circumference of a rubber band to the girth of his genitals.  Between five and ten times, Hightower threw pennies at Plaintiff. She believes he was purposely aiming them down her shirt.

Even if these allegations are true, they do not rise to the severe or pervasive level established by the Eleventh Circuit for hostile work environment sexual harassment.  The frequency of Hightower's remarks, behavior, and advances over a three year period is not frequent enough to be severe or pervasive.  With the

exception of the June 28th incident, Hightower's remarks were "mere offensive utterances." Additionally, Plaintiff worked for Defendant for years without her job performance suffering because of Hightower's actions. *See Howard v. City of Robertsdale*, 168 Fed. Appx. 883, 889-90 (11th Cir. 2006)(holding sexual comments and jokes from Plaintiff's supervisor did not violate Title VII and stating "[m]ere 'sex talk' without more, does not rise to the level of objectively severe and pervasive harassment."); *Grice v. Air Products and Chemicals, Inc., and Limerick*, 2000 WL 353010, at *8 (N.D. Fla. 2000)(holding that multiple incidents of touching the plaintiff's buttocks, waist, shoulders, and back were not severe or pervasive harassment); *Mendoza v. Borden, Inc.*, 195 F.3d 1238 (11th Cir. 1999)(not severe or pervasive when supervisor constantly followed Plaintiff leering at her genitalia and made sniffing motions, rubbed his hips against hers, touched her shoulder, stared at her in "a very obvious fashion," and made comments of a sexual nature).

Defendant also argues that Plaintiff cannot establish a basis for holding Defendant liable for hostile work environment sexual harassment. The recent Supreme Court case, *Vance v. Ball State University*, addressed an employer's vicarious liability for workplace harassment claims:

> Under Title VII, an employer's liability for such harassment may depend on the status of the harasser. If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling workplace conditions. In cases in which the harasser is a

11

>"supervisor," however, different rules apply. If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable.  But if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventative or corrective opportunities that the employer provided. Under this framework, therefore, it matters whether a harasser is a "supervisor" or simply a co-worker.
>
>We hold than an employee is a "supervisor" for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim….

133 S.Ct. 2434, 2439 (2013).  The Supreme Court went on to define "to take tangible employment actions" as "to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities or a decision causing a significant change in benefits." *Id.* at 2443.  The record shows that Hightower was not a supervisor under the Supreme Court's definition.  Therefore, Defendant is only held to a negligence standard.

To establish the affirmative defense, the Court must first determine whether the employer exercised reasonable care to prevent and promptly correct any harassing behavior. *Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1292 (11th Cir. 2007).  Evidence that an employer had an anti-harassment policy and disseminated it to the employee will meet the first element of the affirmative defense. *Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290, 1298 (11th Cir.

2000). On April 3, 2008, Plaintiff acknowledged receipt of the Sheriff's policy on workplace discrimination and harassment. (Doc. 35-2, p. 24). The policy stated:

> An employee who feels that he or she has been subjected to harassment should immediately report such activity to his/her supervisor. If for any reason, the employee is reluctant to report the matter to his or her supervisor or is not satisfied after bringing the matter to the supervisor's attention, the employee may contact the Professional Standards Unit.

*Id.* at 29.

The second inquiry is whether the employee made reasonably sufficient use of the policy in place to put the employer on notice of the problem. *Madray,* 208 F.3d at 1299. Plaintiff claims to have told Johns, a subordinate of Hightower, about the harassment over the years. However, nothing was done until supervisors of Hightower were put on notice. The policy clearly states, "If for any reason, the employee is reluctant to report the matter to his or her supervisor *or is not satisfied after bringing the matter to the supervisor's attention*, the employee may contact the Professional Standards Unit." *Id.* (emphasis added). If the harassment, which Plaintiff claims was so severe and pervasive that she felt forced to resign, was so bad, then certainly she would have utilized the policy and reported the problem to the Professional Standards Unit when Johns took no action. The alleged harassment was happening for years—not weeks or months. There was plenty of time and opportunity for Plaintiff to seek help. *See Farley v. American Cast Iron Pipe*, 115 F.3d 1548, 1554 (11th Cir. 1997)(Where an anti-harassment policy

13

provides multiple avenues to complain and designates individuals to lodge complaints with, "it is incumbent upon the [plaintiff] to utilize the procedural mechanisms established by the company specifically to address problems and grievances."). Here, Plaintiff did not avail herself of the procedures put in place by Defendant to handle workplace harassment.

Lastly, once Defendant was on notice of Plaintiff's allegations, Plaintiff was removed from the situation, and Hightower was eventually suspended, transferred, and removed of his supervisory role.

Because of the above reasons, Plaintiff has not met the fourth and fifth prongs of the test to establish sexual harassment.

### *Constructive Discharge*

"To prove constructive discharge, the employee must demonstrate that [her] working conditions were so intolerable that a reasonable person in their position would be compelled to resign." *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1317 (11th Cir. 1989).

> The "general rule is that is the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation, then the employer has encompassed a constructive discharge and is liable for an illegal conduct involved therein as if it has formally discharged the aggrieved employee."

*Rowell v. BellSouth Corp.*, 433 F.3d 794, 802 (11th Cir. 2005)(quoting *Young v. Southwestern Sav. & Loan Ass'n*, 509 F.2d 140, 144 (5th Cir. 1975)). The

standard for proving constructive discharge is higher than the standard for proving hostile work environment. *Hipp v. Liberty Nat'l Life Insurance Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001). I have already found that Plaintiff could not establish a *prima facie* case for her hostile work environment sexual harassment claim.

Additionally, Plaintiff resigned before Defendant could take remedial action. Courts have found that a reasonable employee is expected to stay and fight the harassment on the job. *Bivens v. Jeffers Vet Supply,* 873 F.Supp. 1500, 1509 (M.D. Ala. 1994), *aff'd*. 58 F.3d 640 (11th Cir. 1995)(no cause of action where employee assumes the worst and resigns before management can be given the chance to rectify the situation). Prompt remedial action is a defense to a constructive discharge claim. *Farley*, 115 F.3d at 1555 (separating plaintiff to another department sufficient to eliminate harassment despite not being remedy selected by plaintiff); *Buchanon v. Sherrill,* 51 F.3d 227, 229 (10th Cir. 1995)(transfer to another location would have eliminated harassment but plaintiff resigned).

In this case, Plaintiff resigned during Hightower's investigation. However, she was transferred to a different division without a downgrade in her pay, hours, benefits, or job duties. After the investigation, Hightower was suspended, transferred, and demoted. Therefore, the remedial remedies taken by Defendant would have alleviated the alleged harassment had Plaintiff not resigned before the investigation was complete. A reasonable employee would not have felt

compelled to resign under such circumstances. Therefore, Plaintiff was not constructively discharged.

*Retaliation*

To establish a prima facie case of retaliation under Title VII, Plaintiff must show that (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is some causal relation between the two events. *Thomas v. Cooper Lighting, Inc.,* 506 F.3d 1361, 1363 (11th Cir. 2007). If Plaintiff can establish a prima facie case, the burden shifts to Defendant to articulate legitimate reasons for the adverse employment action, a burden that is "exceedingly light." *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994). The burden would then shift back to Plaintiff to demonstrate that Defendant's proffered explanations are pretextual. *Id.*

Assuming that Plaintiff's complaints of Hightower's behavior to Johns were the statutorily protected activities, Plaintiff cannot establish a materially adverse employment action. To establish a materially adverse action, Plaintiff must show that the action would have dissuaded a reasonable worker from making or supporting a complaint of discrimination. *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 52, 68 (2006).

The verbal reprimand Plaintiff received on April 22, 2011, was not a materially adverse employment action. First, Plaintiff admitted it had no impact on

her job. The Eleventh Circuit has concluded that "criticisms of an employee's job performance—written or oral—that do not lead to tangible job consequences will rarely form a permissible predicate for a Title VII suit." *Davis v. Town Lake Park*, 245 F.3d 1232, 1241 (11th Cir. 2001). The verbal reprimand did not result in any tangible employment action. Accordingly, "there is no indication that this was a type of reprimand that would dissuade a reasonable worker from making or supporting a charge of discrimination." *Spencer v. City of Hollywood,* 2009 WL 980274, at *6 (S.D. Fla. 2009).

Plaintiff's lateral transfer to the Civil Division was also not a materially adverse employment action. There was no change in her work schedule, pay, or benefits, and the job duties were comparable.

> Obviously a purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action. A transfer involving no reduction in pay and no more than a minor change in working conditions will not do, either. Otherwise every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit. The Equal Employment Opportunity Commission, already staggering under an avalanche of filings too heavy for it to cope with, would be crushed, and serious complaints would be lost among the trivial.

*Mowery v. Escambia County Utilities Auth.*, Case. No. 3:04-cv-382, Doc. 34, p. 22 (N.D. Fla. 2006)(quoting *Williams v. Bristol-Myers Squib Co.*, 85 F.3d 270, 274 (7th Cir. 1996)). Because Plaintiff did not suffer a materially adverse employment action, she cannot establish a retaliation claim.

## IV. CONCLUSION

Therefore, Defendant's Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 34) is **GRANTED**. The Clerk is directed to close the case.

**ORDERED** on August 7, 2013.

/S/ Richard Smoak
**RICHARD SMOAK**
**UNITED STATES DISTRICT JUDGE**
